1
2
3
4
5
6
7
8
# UNITED STATES DISTRICT COURT

9
## SOUTHERN DISTRICT OF CALIFORNIA

10
11
RICHARD INDUSTRIAL PARK, LP, a
California limited partnership; and MARC
12 BARMAZEL, an individual,

13
                                    Plaintiffs,

14                 vs.

15
FEDERAL DEPOSIT INSURANCE
CORPORATION, as receive for La Jolla
16 Bank, FSB; and NATIONSTAR
MORTGAGE, a business entity,
17
                                    Defendants.
18

CASE NO. 11-CV-2059-LAB-POR

**ORDER ON DEFENDANTS'
MOTIONS TO DISMISS**

19          There are two motions to dismiss pending in this case, one filed by the FDIC and the

20 other filed by Nationstar Mortgage.  The Court took them under submission without oral

21 argument.

22 **I.      Factual Background**

23          This case begins with a series of real estate transactions.  The facts surrounding

24 these transactions don't appear to be in dispute.

25          RIP owned real property on Pelican Vista Drive in Newport Beach.  ALB Properties,

26 a developer, owned real property on Roxbury Terrace in Rancho Santa Fe.  ALB, however,

27 had defaulted on its loan  payments to  La Jolla  Bank ("LJB").  With  ALB  in  default, and

28 //

Barmazel envisioning a dream home in Rancho Sante Fe, the parties struck the following two-stage deal.

First, RIP would transfer its Newport Beach property and $1 million in cash to ALB in exchange for ALB's Roxbury Terrace property. LJB would then loan RIP $6.4 million on the property, and Barmazel would also personally guarantee the loan. This got ALB out of the Roxbury Terrace property and replaced a non-performing loan with a performing one. Second, ALB would begin the construction of Barmazel's 23,000 dream home in Rancho Santa Fe on a third property, known as Lot 40. Once the home was finished, RIP would convey the Roxbury Terrace property in exchange for it. The first part of the deal went through, but the second didn't: LJB was closed by the Office of Thrift Supervision and the FDIC was appointed receiver.

After the FDIC took over LJB, RIP filed a claim for fraud and misrepresentation, alleging damages of $4.1 million. According to RIP, it then entered into negotiations with the FDIC to reduce the principal due on the Roxbury Terrace loan *as well as* $693,000 due on the Loma Vista Apartments in Rancho Santa Fe, another one of its properties. RIP, in exchange, offered not to pursue its claim against LJB. RIP wasn't negotiating with the FDIC directly, but with Martin O'Riordan, an employee of the Solomon Edwards Group and an independent contractor. On September 15, 2010 O'Riordan sent an email to Barmazel. The subject line of that email said "Richards industrial 12544 Loma Vista." The body said "The committee has approved the case for a 10% discount on your loans. Please work with your lender to arrange financing."[1] Also on September 15, 2010, the FDIC denied RIP's claim for

---

[1] In its complaint, RIP claims "Mr. O'Riordan's September 15, 2010 written representation was an acceptance of Plaintiffs' offer to not pursue their claims against the FDIC in return for a 10% discount on the Roxbury Loans and the Loma Vista Loan (the 'Agreement')." (Compl. ¶¶ 15.) This is inartfully worded. RIP had no claims against the FDIC at the time; its claims against the FDIC arise out of its subsequent failure to honor the alleged contract signified by the O'Riordan email. Later in its complaint RIP again words the point inartfully, alleging that "the FDIC agreed to reduce by 10% the $6.4 million loans on the Roxbury Property and the Loma Vista Property in return for the Plaintiffs' agreement to not take additional action on their claims against the FDIC and/or officers of La Jolla Bank." (Compl. ¶ 25.) RIP seems to correct this in its opposition brief by leaving the FDIC out of it: "The Plaintiffs agreed to forgo pursuing litigation against La Jolla Bank and its officers." (Opp'n Br. at 5.) "The Plaintiffs have alleged that they agreed to forego not only their claims against La Jolla Bank, but also their claims against the bank's officers." (Opp'n Br. at 6.)

fraud and misrepresentation, giving it 60 days to file a lawsuit. RIP didn't file a lawsuit, however, because it thought it had reached a deal: the FDIC would reduce the principal due on the two loans with LJB by ten percent, and RIP would abandon its claim against LJB.

In the meantime, RIP began to market the Roxbury Terrace property for sale, and it did so on the assumption that the principal it owed on the property would be reduced by 10 percent. It even found a buyer. But both the FDIC and Nationstar Mortgage refused to "provide a payoff demand to escrow"—basically a reduction in the principal due on the Roxbury Terrace property that would increase RIP's profit on the sale. Escrow closed on February 24, 2011 without that reduction, and as a result "the sale proceeds delivered to RIP were reduced to pay the full amount of the Roxbury Loans without reduction." (Compl. ¶ 21.) Later, on March 2, 2011, Nationstar Mortgage sent an email to RIP repudiating the agreement it thought it had entered into. The FDIC later partially performed by reducing the principal due on the Loma Vista loan.

## II.    Legal Standard

A 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering such a motion, the Court accepts all allegations of material fact as true and construes them in the light most favorable to RIP. *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). To defeat a 12(b)(6) motion, a complaint's factual allegations needn't be detailed; they must simply be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "some threshold of plausibility must be crossed at the outset" before a case can go forward. *Id.* at 558 (internal quotations omitted). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

//

While the Court must draw all reasonable inferences in RIP's favor, it need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted). In fact, the Court does not need to accept any legal conclusions as true. *Iqbal*, 556 U.S. at 678. A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations omitted). Nor does it suffice if it contains a merely formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555.

## FDIC'S MOTION TO DISMISS

At the outset, there seems to be a misunderstanding of the scope of RIP's complaint. The FDIC devotes a substantial portion of its brief to the argument that RIP can't state a *pre-receivership* fraud claim against LJB or the FDIC. That seems to be a non-issue. RIP makes clear in its opposition brief that "all of [its] claims concerned FDIC action after the receivership had been imposed." (Opp'n Br. at 11.) That is to say, RIP's claims are "based on the FDIC's own conduct — after it took over La Jolla Bank." (Opp'n Br. at 2.)

This conduct, of course, is the FDIC's representation that it would reduce the principal due on RIP's two loans by 10 percent in exchange for RIP dropping its claim against LJB—and its subsequent refusal to do that. This gives rise to five claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) negligent misrepresentation; (4) negligence; and (5) unjust enrichment.

## I.    Breach of Contract

The FDIC offers four arguments for the dismissal of RIP's breach of contract claim, and the Court will address them in sequence.

### A.    Lack of Mutuality

First, the FDIC argues that the O'Riordan email that is the basis of RIP's claims only offered a reduction in the principal due on the Loma Vista Apartments, *not* the principal also due on the Roxbury Terrace property. Contracts require mutual consent, and if the FDIC is right about the O'Riordan email it never consented to the principal reduction RIP alleges it

did.  *See* Cal. Civ. Code § 1550; *Kruse v. Bank of America*, 202 Cal.App.3d 38, 59 (Cal. Ct. App. 1988) ("It is, of course, elemental that creation of a valid contract requires mutual assent ordinarily evidenced by an offer and acceptance.").  Frankly, the email is ambiguous.  The subject line references only the Loma Vista loan, but there was only one such loan and the body of the email mentions "a discount on [RIP's] loans," in the plural.  Thus, it's not plain to the Court, assuming the email does represent a binding contract to reduce loan principal, that it excluded the Roxbury Terrace property.

It's worth adding that RIP barely survives here.  The reasonable reader would attach far more significance to the subject line of O'Riordan's email than the fact that the body of the email mentions "loans" in the plural.  It's definitely not the *most* reasonable reading of the email  that "loans" in the body overrides the limited reference to "12544 Loma Vista" in the subject line and subjects all of RIP's loans in its portfolio with LJB to a 10 percent reduction in principal.

## B.    Lack of Consideration

The FDIC's next argument is that the O'Riordan email was a mere "gratuitous promise," not a binding contract with consideration on both sides.  California law defines good consideration as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor."  Cal. Civ. Code § 1605.  In other words, the promisee must confer some benefit or agree to suffer some prejudice, and that benefit or prejudice must have been bargained for by the promisor—it must have induced the promisor's promise.  *Steiner v. Thexton*, 48 Cal.4th 411, 420–21 (2010).  The question this presents is whether RIP's promise not to pursue its claim for fraud and misrepresentation against La Jolla Bank and its officers constitutes consideration.

As a general rule, "[f]orbearance to sue on a claim . . . may be sufficient consideration for a promise."  *Michaelian v. State Comp. Ins. Fund*, 50 Cal.App.4th 1093, 1112 (Cal. Ct. App. 1996).  That's not true, however, "when the claim is wholly invalid or worthless."  *Id*.

*See also Kim v. Son*, 2009 WL 597232 at *2 (Cal. Ct. App. 2009) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 211, p. 247) ("However, if the forbearance has no value, it will not suffice."); *In re Marriage of Nevitt*, 2006 WL 188870 at *7 (Cal. Ct. App. 2006) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 220, pp.253–54) ("'Neither forbearance to sue, nor a compromise' of a wholly invalid claim 'constitutes adequate consideration.'"); *Union Collection Co. v. Buckman*, 150 Cal. 159, 163 (1907) ("[T]o make a compromise of a claim . . . sufficient to constitute a consideration for a new promise, the claim must not be wholly without foundation, and known to the claimant to be so."). In other words, forbearance to sue on a claim can be consideration when the claim is valid or disputed, but not when it is void. *In re Marriage of Nevitt* at *8 (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 211, pp. 246–47).[2]

Is RIP's claim for fraud and misrepresentation against LJB wholly invalid and worthless? The FDIC argues that it is in light of the *D'Oench, Duhme* doctrine, codified by 12 U.S.C. §1823(e)(1):

> No agreement which tends to diminish or defeat the interest of [the FDIC] in any asset acquired by it . . .shall be valid against [the FDIC] unless such agreement
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

---

[2] RIP cites the holding of the California Court of Appeal that "forbearance to press a claim or a promise of such forbearance . . . may be a sufficient consideration even though the claim is wholly ill-founded." *Healy v. Brewster*, 251 Cal.App.2d 541, 551 (Cal. Ct. App. 1967). Depending on what the phrase "ill-founded" means, this isn't necessarily inconsistent with the later case law citing to Witkin, and holding that forbearance of an invalid, worthless, or value-less claim cannot constitute consideration. In other words, it's possible that a claim could be ill-founded, meaning the claim holder is very mistaken as to its legal or factual foundation, and yet the claim might not be wholly invalid, meaning that it's dead on arrival and doesn't even get off of the ground. So, the principle stands that "[f]orbearance to assert . . . a claim . . . which proves to be invalid is not consideration unless (a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law . . . ." *Union Oil Co. of California v. Terrible Herbst, Inc.*, 331 F.3d 735, 741 (9th Cir. 2003) (quoting Restatement (Second) of Contracts § 74(1)(a) (1981).

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

One purpose of § 1823 is "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets." *Langley v. FDIC*, 484 U.S. 86, 91 (1987). This wouldn't be possible "if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." *Id*. at 92. A second purpose of § 1823 is to "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Id.* The Ninth Circuit has explained that "the *D'Oench, Duhme* doctrine . . . is a principle of equitable estoppel that permits bank examiners to rely on the records of a bank in evaluating the bank's financial condition, by protecting the bank authorities from suits founded on undisclosed conditions or deceptive documents." *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 493 (9th Cir. 1995). This estoppel doctrine "precludes enforcement of any oral agreement that contradicts representations made to the FDIC." *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1581 (10th Cir. 1993).

The FDIC characterizes RIP's alleged agreements with LJB and ALB as "a series of oral side agreements" that are precisely the kind of "contract" barred by § 1823(e)(1). (Mot. to Dismiss at 10.) Apparently nothing was reduced to writing, there is no evidence that the agreements were made contemporaneously with the acquisition of the asset (RIP's loan payments) by LJB, and there is also no evidence that the alleged agreements were approved by LJB's board of directors and made an official record of LJB. Thus, as the FDIC argues, "any purported claims that Plaintiffs may have had against LJB were rendered valueless as a result of the receivership, and therefore, cannot form the basis of any claim for damages against the FDIC-R." (Mot. to Dismiss at 10.) The Court agrees. The alleged agreements are precisely the kind that § 1823 renders wholly invalid, and as a result, RIP's forbearance //

- 7 -

to sue under them cannot be consideration for the FDIC's alleged promise to discount the principal due on the Roxbury Terrace loan. And *that* means there is no contract.

RIP's rebuttal to this is feeble and unsatisfying. First, RIP basically concedes that § 1823(e)(1) may be fatal to its claim against LJB, but argues nonetheless that the statute doesn't bar its claim against LJB's officers. Be that as it may, the FDIC doesn't stand to benefit, at all, from RIP waiving its claims against LJB's officers in their individual capacities. Thus, forbearance to sue still isn't meaningful consideration. Second, RIP suggests, in a rather cagey way, that the alleged agreements with LJB may be able to meet the requirements of § 1823(e)(1) after all—but not until RIP can take some discovery and review LJB's books and records. RIP only hopes this is true, though; it gives the Court no firm reason to believe the discovery it seeks would be fruitful. Moreover, § 1823(e)(1) requires that the agreement at issue be in writing, and RIP shouldn't need any discovery to make that showing. If the alleged agreements actually were reduced to writing, the Court presumes that RIP would have copies and could produce them now. Lastly, RIP argues, citing *Healy*, that even if its claim against LJB is "ill-founded" forbearance to sue could still constitute consideration provided it had a good faith belief that the claim was valid. On the Court's understanding, though, an "ill-founded" claim that may nonetheless constitute consideration is simply one that is disputed and destined, ultimately, to fail. RIP's claim against LJB is certainly that, but it's also wholly invalid. Section 1823(e)(1) clearly bars it.

In light of the above, the Court finds that the FDIC's alleged agreement with RIP to discount the principal due on RIP's Roxbury Terrace loans was not supported by consideration on both sides. That means there was no contract, and RIP's breach of contract claim is therefore **DISMISSED WITH PREJUDICE**.[3]

//

//

---

[3] The Court will not consider at this point the FDIC's remaining two arguments for dismissal of the breach of contract claim, namely that it is barred by the statute of frauds and that O'Riordan lacked the authority to bind the FDIC. The Court will consider the former argument later in this Order.

**II.     Breach of the Covenant of Good Faith and Fair Dealing**

The covenant of good faith and fair dealing presumes the existence of a valid contract.  *See Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 349 (2000) (recognizing that the covenant is "implied by law in every contract"); *Nein v. HostPro, Inc.*, 174 Cal.App.4th 833, 852 (Cal. Ct. App. 2009) (recognizing that the covenant "is designed to effectuate the intentions and reasonable expectations of parties reflected by mutual promises within the contract").  Because the Court has found there was no contract between RIP and LJB and dismissed RIP's breach of contract claim with prejudice, RIP's claim for breach of the covenant of good faith and fair dealing must also be **DISMISSED WITH PREJUDICE**.

**III.     Negligent Misrepresentation**

RIP's third claim against the FDIC is for negligent misrepresentation.  The claim resembles the breach of contract claim: the FDIC represented in writing on September 15, 2010 that it would reduce the principal due on the Roxbury Terrace loan by 10 percent, RIP relied on this representation in marketing and selling the Roxbury Terrace property, the representation turned out to be false, and the FDIC should have known it wouldn't honor the representation.  (Compl. ¶¶ 39–42.)

The Federal Tort Claims Act bars claims against the United States—and by extension, the FDIC—that arise out of "misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h).  *See also Pauly v. U.S. Dep't of Agric.*, 348 F.3d 1143, 1151 (9th Cir. 2003) (per curiam) (United States retains its immunity against claims excluded from the FTCA, such as those arising out of negligent or fraudulent misrepresentation).  This claim is **DISMISSED WITH PREJUDICE**.

**IV.     Negligence**

Next is RIP's negligence claim.  A negligence claim must begin, obviously, with a duty, and RIP alleges that the FDIC "owed a . . . duty of care to act reasonably, promptly, and accurately in conveying to escrow any decisions previously made by the FDIC regarding the reduction of principal balances." (Compl. ¶ 45.) It breached this duty "by refusing to //

accurately send a payoff demand reflecting a 10 percent reduction in principal of the Roxbury . . . ." (Compl. ¶ 46.)

The Federal Tort Claims Act doesn't just bar claims that are *labeled* as misrepresentation claims; it bars claims "arising out of" misrepresentation. 28 U.S.C. 2680(h). The FDIC cites *Metz v. United States* for the proposition that this "arising out of" language should be broadly construed, and *Metz* does say that. 788 F.2d 1528, 1533 (11th Cir. 1986). But *Metz* appears to have misunderstood the case on which it relies, *Kosak v. United States*, 465 U.S. 848 (1984). The Supreme Court in *Kosak* noted that the *Court of Appeals* suggested § 2680 should be broadly construed, but it went on to say "We find such an approach unhelpful." *Id.* at 854 n.9. It then explained, "Though the Court of Appeals is certainly correct that the exceptions to the Tort Claims Act should not be read in a way that would 'nullif[y them] through judicial interpretation,' unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute." *Id.*

The FDIC is better off sticking to the point that "it is the substance of the claim and not the language used in stating it which controls whether the claim is barred by an FTCA exception." *JBP Acquisitions, LP v. U.S. ex rel. FDIC*, 224 F.3d 1260, 1264 (11th Cir. 2000) (internal quotations omitted). The court in *JBP Acquisitions* explained that "[t]he exception covers actions for negligence when the basis for the negligence action is an underlying claim for misrepresentation." *Id.* RIP can't get around that "simply through the artful pleading of its claims." *Id.* Nonetheless, RIP argues that its claim for negligence "was not based primarily on a misrepresentation but rather the FDIC's negligence in performing its duties." (Opp'n Br. at 12.) That's not persuasive. "The test in applying the misrepresentation exception is whether the essence of the claim involves the government's failure to use due care in obtaining and communicating information." *JBP Acquisitions*, 224 F.3d at 1264. That is precisely what RIP's negligence claim is all about, however: the FDIC allegedly agreed to discount the principal on the Roxbury Terrace loan but it subsequently failed to "send a payoff demand" to escrow—that is, it failed to communicate and enforce the agreed-upon reduction. The FDIC had no free-floating, independent duty to reduce the principal on the

Roxbury Terrace loan, and RIP doesn't allege otherwise.  Rather, to the extent it had such

a duty, it traced to the FDIC's alleged *representation* that it would reduce the principal.  That

means that RIP's negligence claim arises out of a misrepresentation, and *that* means it is

barred by § 2680(h).  *See Block v. Neal*, 460 U.S. 289, 296–97 (1983) ("Section 2680(h)

thus relieves the Government of tort liability for pecuniary injuries which are wholly

attributable to reliance on the Government's negligent misstatements.").  The claim is

therefore **DISMISSED WITH PREJUDICE**.

## V.    **Unjust Enrichment**

RIP's last claim, for unjust enrichment, is somewhat perplexing.  In its complaint, it

alleges that "the FDIC was unjustly enriched by obtaining greater proceeds than would have

been appropriate pursuant to the Agreement for reduction of the principal of the Roxbury

Loans by 10 percent."  (Compl. ¶ 49.)  But RIP's part of the alleged "Agreement" was to not

pursue its fraud and misrepresentation claim against *LJB*, and it's hard to see how that

forbearance directly enriched the *FDIC*.   Moreover, and more importantly, RIP's unjust

enrichment claim stated this way runs into the same problem as its negligence claim: it

arises out of the FDIC's alleged misrepresentation that it would reduce the principal on the

Roxbury Terrace loan, and as such it would appear to covered by the misrepresentation

exception to the Federal Tort Claims Act.  *See* 28 U.S.C. § 2680.

In RIP's opposition brief, the claim changes.  Not only did RIP pledge to drop its claim

against LJB, but on the FDIC's request it later sold the Roxbury Terrace property to pay off

the loan in its entirety.  It's the latter that's now the basis of the unjust enrichment claim:

"Plaintiffs' claim for unjust enrichment alleges that the Plaintiffs obtained full repayment of

the loans on the Roxbury property without the 10 percent reduction."  (Opp'n Br. at 12.)

Knowing that this allegation is nowhere to be found in its complaint, RIP asks for leave to

amend its complaint:

> The Plaintiffs seek leave to amend to file a First Amended
> Complaint that would allege that the parties agreed to take the
> Plaintiffs' loans "off of the FDIC's books."  Taking the La Jolla
> Bank loans "off the books" of the FDIC represents a detriment to
> the Plaintiffs in terms of having to fully repay these loans well in
> advance of their maturity date—during a significant real estate

1
2

> down market—and also a significant benefit to the FDIC in that it received a cash infusion of more than $6 million into the estate, rather than receiving loan payments over several years.

3  (Opp'n Br. at 8.)

4      Unjust enrichment is an equitable doctrine that applies where plaintiffs, "while having

5  no enforceable contract, nonetheless have conferred a benefit on defendant which

6  defendant has knowingly accepted under circumstances that make it inequitable for the

7  defendant to retain the benefit without paying for its value." *Hernandez v. Lopez*, 180

8  Cal.App.4th 932, 938 (Cal. Ct. App. 2009). *See also FDIC v. Dintino*, 167 Cal.App.4th 333,

9  346 (Cal. Ct. App. 2008) ("However, a cause of action for unjust enrichment is *not* based on,

10 and does not otherwise arise out of, a written contract. Rather, unjust enrichment is a

11 common law obligation implied by law based on the equities of a particular case and not on

12 any contractual obligation."). This presents a problem for RIP, because it frames its

13 proposed amendment to its complaint as part of its agreement, or contract, with the FDIC:

14
15
16
17

> Second, the Plaintiffs seek leave to amend to allege that FDIC **insisted as part of the parties' agreement** that the Plaintiffs get their loans "off the books" of the FDIC. Plaintiffs sold their properties pursuant to the parties' agreement, early before the loans were due. The loans held by the FDIC were thus paid off early, resulting in a cash infusion into the FDIC receivership of more than $6 million. (Opp'n Br. at 3.)

18
19
20
21

> In addition, as stated above, the Plaintiffs will seek leave to amend to include the allegations that the parties **also specifically agreed** to get the Plaintiffs' loans 'off the books' of the FDIC as receiver, thus having all principal fully repaid (with the 10 percent reduction) early, rather than having the loans repaid over a period of years. (Opp'n Br. at 5.)

22
23

> The Plaintiffs seek leave to amend to file a First Amended Complaint that would allege that **the parties agreed** to take the Plaintiffs' loans "off of the FDIC's books." (Opp'n Br. at 8.)

24 If the full and early repayment of the Roxbury Terrace loan was a term of RIP's agreement

25 with the FDIC, however, it can't be the basis of an equitable, unjust enrichment claim. "[A]s

26 a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here,

27 express binding agreements exist and define the parties' rights." *Cal. Medical Ass'n v. Aetna

28 U.S. Healthcare of Cal., Inc.*, 94 Cal.App.4th 151, 172 (Cal. Ct. App. 2001). *See also*

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal.App.4th 1410, 1420 (Cal. Ct. App. 1996) ("When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract.").

This isn't to say that the mere existence of a contract between two parties occupies the field, as it were, of any future lawsuits between them. It's just to say that when the lawsuit alleges the breach of a material term of the contract, the equitable doctrine of unjust enrichment can't come into play. The California Court of Appeal's recent decision in *Hong v. Park* addresses this. Recognizing that "unjust enrichment and breach of contract are exclusive theories of recovery," it explained that "it does not follow from the existence of a contract between the parties that all disputes arising out of that agreement must be contractual, rather than equitable or quasi-contractual in nature." 2011 WL 2323777 at *4 (Cal. Ct. App. June 13, 2011). For RIP, so far, so good. But the court *further* explained that when a contract does exist, an unjust enrichment claim cannot survive if it is "an attempt to recover for a breach of any material term thereof." *Id.* at *5. If the claim simply has its "genesis" in the contract, however, then it can survive. *Id.* An unjust enrichment claim survived in *Hong*, notwithstanding the existence of a contract, because of the narrow basis on which the claim was asserted:

> Plaintiffs in this case, however, did not seek to impose and recover on a quasi-contractual obligation that was inconsistent with the terms of the parties' contract. Rather as we have explained, plaintiffs' theory of unjust enrichment was that Park initially performed his contractual obligations but later unfairly impaired the use of the Korean properties, while continuing to realize increased profits from the business.

*Id.* at *6. RIP's unjust enrichment claim is distinguishable. It is plainly an attempt to recover on what RIP believes was a breached term of the alleged contract between RIP and the FDIC, formalized in the September 14, 2010 email from O'Riordan. That takes equitable relief out of the picture, and the claim is therefore **DISMISSED WITH PREJUDICE**. (And this is assuming the Court were to grant RIP leave to amend its complaint.)

//

## VI.    Leave to Amend

The question remains whether the Court should grant RIP leave to amend its other claims—breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and negligence—to include the allegation that the FDIC asked for repayment of the Roxbury Terrace loan in full in exchange for a 10 percent reduction in its principal.  Rule 15 of the Federal Rules of Civil Procedure mandates that leave to amend "be freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "Liberality in granting a plaintiff leave to amend is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile."  *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999).

At the outset, the Court notes that the proposed amendment wouldn't save RIP's claims for negligent misrepresentation and negligence.  Even with the additional factual basis, those claims would still be barred by the misrepresentation exception to the Federal Tort Claims Act for reasons given above.  It also wouldn't save the unjust enrichment claim, as just explained.  Only two claims, then, stand to benefit from the amendment: breach of contract and breach of the covenant of good faith and fair dealing.

In addressing the breach of contract claim above, the Court noted that the FDIC offered four arguments for dismissing it.  The Court made it through only two of those arguments—lack of mutuality and lack of consideration—before it found the claim to fail for lack of consideration.  The amendment would solve the lack of consideration problem, however.  Unlike the alleged commitment to abandon a wholly invalid claim, the commitment to pay off the entirety of the Roxbury Terrace loan could constitute consideration for the FDIC's alleged commitment to reduce the principal due by 10 percent.  That brings the Court to the FDIC's argument that RIP's breach of contract claim is barred by the statute of frauds.

Under California law, a mortgage or deed of trust comes within the statute of frauds. *Secrest v. Security Nat. Mortgage Loan Trust 2002-2*, 167 Cal.App.4th 544, 552 (Cal. Ct. App. 2008).  An agreement to modify a contract that is subject to the statute of frauds is also

subject to the statute of frauds.  *Id.* at 553.   Putting those two principles together, it would seem that the alleged contract between RIP and the FDIC comes within the statute of frauds.[4]  RIP had a mortgage on the Roxbury Terrace property, and by the alleged contract it agreed to pay off the mortgage completely and early in exchange for a ten percent reduction in principal.   RIP doesn't object to any of this, and instead insists that the September 15, 2010 email satisfies the statute of frauds.  That obviously begs the question whether it needs to specify *all* of the contract's terms, and RIP argues that it doesn't.  But the two cases RIP relies on aren't at all on point.

In *Ayoob v. Ayoob*, the court recognized that "an oral agreement may be taken out of operation of the statute [of frauds] by a written memorandum executed subsequently," even if the memorandum doesn't reference the oral agreement.  But  the discussion is clear that this only holds when there's no meaningful discrepancy between the two. 74 Cal.App.2d 236, 241–43 (Cal. Ct. App. 1946).  RIP is urging a completely different principle, namely that as long as there is *some* written agreement between two parties, it gives force *any* allegedly prior oral agreement between them.   That can't be right.   RIP also relies on a few cases holding that agreements to convey real property needn't contain the property description so long as they contain some "means or key" by which the property can be specifically identified.  (*See* Opp'n Br. at 9.)  These cases aren't helpful at all, because there is *nothing* in the September 15, 2010 email that identifies or even implies the terms RIP would have the Court recognize as binding.  To the contrary, the email's subject line identifies one piece of property—*not* the Roxbury Terrace property—and says nothing whatsoever about a

[4] The FDIC also suggests that Cal. Civ. Code § 1624(a)(7) subjects the alleged agreement to the statute of frauds.  That section applies to contracts "to loan money or to grant or extend credit . . . not primarily for personal, family, or household purposes," and it clarifies that "a contract, promise, undertaking or commitment to loan money secured solely by residential property consisting of one to four dwelling units shall be deemed to be for personal, family, or household purposes."  The Roxbury Terrace loan was secured by residential property, which suggests it is a loan for "personal, family, or household purposes" and therefore not subject to this provision.  At the same time, the loan wasn't secured *solely* by residential property because Barmazel also personally guaranteed it, but does this mean the loan was *not* "primarily for personal, family, or household purposes such that the statute of frauds does apply?   Either way, the Court needn't determine the significance of § 1624(a)(7) because the case law is independently clear that a mortgage agreement and mortgage modification agreement are subject to the statute of frauds.

- 15 -

principal reduction on the Roxbury Terrace property being consideration for RIP's commitment to not pursue a claim against LJB and to pay off the Roxbury Terrace loan in full.

RIP next argues that it fully performed its end of the bargain with the FDIC, and that this performance satisfies the statute of frauds. RIP is certainly right that as a general principle "a bilateral contract falling within the statute of frauds may become enforceable if one party has fully performed." *Winchester Drive-In Theatre, Inc., Inc. v. Warner Bros. Pictures Distributing Corp.*, 358 F.2d 432, 434 n.2 (9th Cir. 1966). *See also Peterson v. Carrington Mortg. Servs., LLC*, 2011 WL 6934551 at *12 (Cal. Ct. App. Dec. 28, 2011). But that principle only works where it's somewhat uncontested that there was in fact a prior oral agreement, or else where the performance itself is substantial proof that there was. Otherwise, one party could simply do something that benefits another, invent an oral agreement, and then claim the agreement isn't barred by the statute of frauds because it performed. In *Secrest*, for example, the court recognized that the acts constituting performance must "unequivocally refer" or "clearly relate" to the oral agreement so as to "satisf[y] the evidentiary function of the statute of frauds by confirming that a bargain was in fact reached." 167 Cal.App.4th at 555. That's a substantial problem for RIP. The FDIC denies that there was ever an agreement whereby RIP would forbear to sue on its claim against LJB *and* pay off the Roxbury Terrace loan in full, in exchange for the FDIC knocking 10 percent off of the principal due on the Roxbury Terrace loan. RIP can't establish that there was such an agreement just by showing that it sold the Roxbury Terrace property prematurely and paid off the loan in full. It may, after all, have had some other incentive to make that sale. *See Hall v. Hall*, 222 Cal.App.3d 578, 586 (Cal. Ct. App. 1990) ("Acts which, although done in performance of the contract, admit to an explanation other than the contract (such as the performance of husbandly or wifely duties) are not generally acts of partial performance which will take the agreement out of the statute of frauds."). Finally, the statute of frauds will only be lifted as a bar to the enforcement of an oral agreement when invoking it would cause an unconscionable injury to a party that has changed its position in

reliance on the agreement. *Secrest*, 167 Cal.App.4th at 555. Here, RIP alleges that had it not sold the Roxbury Terrace property in order to pay off the loan at the FDIC's request, "it could have simply waited for a much better real estate market that would garner . . . a higher sales price." (Opp'n Br. at 13.) That's certainly speculative, and the Court questions whether selling the Roxbury Terrace property prematurely really rises to the level of an unconscionable injury.

The Court finds that RIP's proposed amendment would be futile and **DENIES** RIP leave to amend. Even if it could allege that the FDIC asked it get the Roxbury Terrace loan off of its books in exchange for a 10 percent reduction in principal, RIP would only be alleging an oral agreement that is barred by the statute of frauds.

## VII.  Conclusion

Each of RIP's five claims against the FDIC is **DISMISSED WITH PREJUDICE**. Moreover, RIP's request for leave to amend its complaint is **DENIED**. The FDIC's motion to dismiss is therefore **GRANTED**.

## NATIONSTAR MORTGAGE'S MOTION TO DISMISS

Only two of RIP's claims are also alleged against Nationstar Mortgage: negligence and unjust enrichment. Nationstar was negligent, according to RIP, for failing to implement the FDIC's approval of a 10 percent reduction in the principal due on the Roxbury Terrace loan, and it was unjustly enriched by obtaining inappropriate fees when the Roxbury Terrace property was sold.

To be more specific, on February 16, 2011, after RIP had obtained what it thought was a principal reduction on the Roxbury Terrace loan from the FDIC, it wrote to Michael Ashby of Nationstar Mortgage. Nationstar Mortgage was the servicing agent of the Roxbury Terrace loan, and RIP asked for a payoff demand reflecting the 10 percent principal reduction. (Compl. ¶ 19.) According to RIP, Mr. Ashby "deflected" at first and said he would have to obtain more information, but then on February 17, 2011 wrote, "The approving parties demanded that even though they gave us an approved value that  a case be written and 'officially' approved through their internal processes for reporting and audit purposes.

The case was re-written and submitted to them on Thursday and now I am just awaiting their response." (*Id.*)  RIP calls this "false," but it doesn't allege that Ashby knew or intended it to be false; it just claims that the FDIC had approved the reduction.  The payoff demand was never provided, and escrow on the Roxbury Terrace property closed on February 24, 2011. (*Id.* at ¶ 20.)  Later, on March 2, 2011, Ashby sent an email to RIP, acting as the FDIC's agent, repudiating the alleged agreement between RIP and the FDIC.  (*Id.* at 22.)

Again, the Court will address the claims in sequence.

## I.    Negligence

A negligence claim has to start with a duty of care.  *United States Liability Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 594 (1970).  "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."  *Nymark v. Heart Fed. Savings & Loan Ass'n*, 231 Cal.App.3d 1089, 1096 (Cal. Ct. App. 1991).  This rule has been applied to loan servicers.  *See Shepherd v. American Home Mortg. Servs., Inc.*, 2009 WL 4505925 at *2 (E.D. Cal. Nov. 20, 2009) ("In fact, loan servicers do not owe a duty to the borrowers of the loans they service."); *Mulato v. WMC Mortg. Corp.*, 2009 WL 3561536 at *3 (N.D. Cal. Oct. 27, 2009).

RIP concedes it never alleged that Nationstar Mortgage owed it a duty of care.  This means any such duty must either be assumed or the product of a special relationship.  *See Webb v. Indymac Bank Home Loan Servicing*, 2010 WL 121084 at *3 (E.D. Cal. Jan. 7, 2010) ("Absent contrary authority, a pleading of an assumption of duty by [the loan servicer], or a special relationship, plaintiffs cannot establish that [the loan servicer] owed a duty of care.").  According to RIP, there was a special relationship here:

> Plaintiffs have alleged that Nationstar had a duty of care because of the unique facts regarding the FDIC agreement to reduce the principal.  Nationstar was no longer acting as a simple loan servicer, but rather as an agent to implement a settlement of a $4.1 million fraud claim.  And although Nationstar was an agent of the FDIC, that does not preclude it from also becoming a dual agent for the limited purpose of implementing the settlement.

//

(Opp'n Br. at 4.) This is a new allegation, though. In its complaint, RIP simply alleges that: (1) it asked Nationstar for a payoff demand; (2) Nationstar responded that it needed the FDIC's approval; (3) it continued to request a payoff demand; and (4) Nationstar subsequently informed RIP that the FDIC had repudiated the alleged agreement. (Compl. ¶¶ 19, 20, 22.) RIP also alleges that Nationstar failed to "accurately inform the administrative agents at the FDIC with whom Michael Ashby at Nationstar had been communicating that there had been a previous written commitment to reduce the principal of the Roxbury Loans by 10 percent," but this makes very little sense. (*Id.* at ¶ 46.) Obviously, there would have been no duty for Nationstar Mortgage to inform the FDIC of an agreement that allegedly the FDIC had already entered into. (And if there was, the duty owed would be to the FDIC, not RIP.) The point here is simply that RIP alleges no facts to support its contention that Nationstar Mortgage was anything other than a typical loan servicer; it certainly has failed to allege facts that Nationstar Mortgage assumed the position of the FDIC's agent for the purposes of implementing the alleged agreement.

There are a couple of other problems with RIP's negligence claim against Nationstar Mortgage. First, even assuming RIP was owed a duty of care, it's not clear how Nationstar Mortgage breached it. As the Court observed above, RIP doesn't even allege that Nationstar Mortgage knew of the O'Riordan email and the alleged agreement between RIP and the FDIC, so when Michael Ashby "deflected" and said he needed approval from the FDIC, he was probably being truthful. Second, RIP's conclusory statement that Nationstar Mortgage was a dual agent of the FDIC and RIP has no basis in the complaint or, for that matter, the law. *See* Compl. ¶¶ 19, 45; *In re Fontes*, 2011 WL 3300933 at *5 (9th Cir. BAP Apr. 22, 2011) ("Generally, a loan servicer acts only as the agent of the owner of the instrument."). Third, there is a damages problem. Nationstar Mortgage had no power to force the FDIC to honor the alleged agreement with RIP, so it is really only the FDIC's alleged conduct here that caused RIP to incur damages. In any event, the Court has thoroughly considered the parties' arguments here and finds that Nationstar Mortgage has far and away the better ones. RIP's negligence claim against it is **DISMISSED WITH PREJUDICE**. RIP's request

to amend its complaint to allege that Nationstar assured RIP the alleged agreement would be honored is **DENIED**. That allegation is vague as stated, and the Court doesn't believe it would alter the above analysis.

## II. Unjust Enrichment

Nationstar Mortgage argues that RIP's unjust enrichment claim fails because it is conclusory. It is certainly thin. In essence, RIP assumes that because the FDIC obtained greater proceeds from the pay-off of the Roxbury Terrace loan than it should have, Nationstar obtained inappropriate fees that it should be forced to disgorge. But as Nationstar Mortgage points out, this assumes, without any supporting allegations, that Nationstar Mortgage played a role in the actual sale of the Roxbury Terrace property and subsequent repayment in full of the Roxbury Terrace loans. Even if that assumption is correct, RIP also assumes, without any supporting allegations, that Nationstar Mortgage's fees are tied to the amount of the loan at issue.

But there is an even more fundamental problem with RIP's claim. For RIP to maintain a claim for unjust enrichment, it must show that Nationstar Benefit received some benefit and unjustly retained that benefit at RIP's expense. *Delfino v. Platinum Community Bank*, 628 F.Supp.2d 1226, 1236 (S.D. Cal. 2009). All RIP mentions, however, are "fees" received by Nationstar Mortgage, and it doesn't even allege that it paid those fees. It also doesn't allege that Nationstar Mortgage wasn't entitled to them, or that the fees were higher than they would have otherwise been because the FDIC refused to reduce the principal due on the Roxbury Terrace loan. The claim is wholly speculative and imprecisely plead, and it is **DISMISSED WITH PREJUDICE**.

## III. LEAVE TO AMEND

RIP requests leave to amend its complaint to add a claim for negligent misrepresentation against Nationstar Mortgage. In making this request, it alleges some new facts.

> Plaintiffs would be able to allege that after Mr. O'Riordan sent his September 15, 2010 email, he ceased being the FDIC's agent. Brent Gillen of Nationstar then took over responsibility for the loans. Mr. Gillen gave the Plaintiffs assurances that the

> FDIC would honor the September 15, 2010 agreement. Plaintiffs relied on these representations by lowering the price of the Roxbury Property . . . .
>
> Mr. Gillen was replaced by Mr. Ashby of Nationstar, who repudiated the agreement, but not until after the die had been cast and agreements reached to sell the Roxbury Property.

(Opp'n Br. at 8.) The Court agrees with Nationstar Mortgage that this amendment would be futile because it contradicts other factual allegations in the complaint. RIP's story is consistently that it relied on the O'Riordan email, dated September 15, 2010, in electing not to pursue its fraud and misrepresentation claim against LJB *and* in selling the Roxbury Terrance property and repaying the loan in full. For example:

> In reliance on the written representation that the FDIC had accepted Plaintiffs' offer of a 10% discount in return for an agreement to refrain from pursuing the Claim, Plaintiffs had refrained from filing a lawsuit within 60 days of the Denial of Claim, and also proceeded to place the Roxbury Terrace property up for sale. The Plaintiffs designed their marketing and sales strategy around the written representation that the principal of the Roxbury Loans would be reduced by 10% pursuant to the FDIC's written agreement and representation in its September 15, 2010 written communication that it would do so.
>
> In reliance on the written representations in the September 15, 2010 correspondence, the Plaintiffs developed a marketing strategy and ultimately entered into an agreement to sell the Roxbury Property based on such representations and the assumption that the principal on the Roxbury Loans would be reduced by 10%.

(Compl. ¶¶ 17, 41.) Perhaps RIP is now suggesting that it relied *both* on the O'Riordan email and Gillen's alleged assurances, in which case the Court can look past this apparent inconsistency. There's yet another potential inconsistency, which Nationstar Mortgage points out. Over a week before escrow closed, Michael Ashby of Nationstar Mortgage told RIP the FDIC hadn't officially approved the principal reduction, so it can't be the case that RIP relied on Gillen's assurances that the principal reduction would happen through the sale of the Roxbury Terrace property. Here again, though, RIP may have an explanation. It claims to have relied on Gillen's assurances only in lowering the price on and agreeing to sell the Roxbury Terrace property, and it's conceivable that these decisions were made *before* the O'Riordan email such that RIP had no choice but to go through with the sale. But even then,

the principal reduction was worth $640,000. It's hard to believe if RIP had already committed to selling the Roxbury Terrace property, a breach of this commitment would have cost it *more* than $640,000 and that the economically sensible thing to do was begrudgingly sell the property.

Finally, the Court would add that neither party has addressed the actual elements of a negligent misrepresentation claim: (1) the misrepresentation of a past or existing material fact; (2) without reasonable ground for believing it to be true; (3) with intent to indue another's reliance on the fact misrepresented; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 243 (Cal. Ct. App. Dec. 20, 2007). As RIP pitches the amendment, it alleges a misrepresentation, its own justifiable reliance, and resulting damage—but three out of five elements doesn't state a claim. RIP fails to allege that Gillen had reason to believe that O'Riordan email would not be honored, and it also fails to allege that Gillen's motive was to induce reliance on RIP's part so that it would drop its claim against LJB, sell the Roxbury Terrace property, and pay off the loan. RIP's proposed amendment is therefore futile. It is incomplete as offered, and as a result RIP's request for leave to amend is **DENIED**.

## IV.    Conclusion

Each of RIP's two claims against Nationstar Mortgage is **DISMISSED WITH PREJUDICE**. Moreover, RIP's request for leave to amend its complaint to add a negligent misrepresentation claim is **DENIED**. Nationstar Mortgage's motion to dismiss is therefore **GRANTED**.


**IT IS SO ORDERED**.

DATED:  May 30, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

- 22 -